UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

LORENZO CLARK,

|  |  |
|---|---|
| | **COMPLAINT** |
| **Plaintiff,** | *Jury Trial Demanded* |
| | |
| -against- | **Civil Action No:** |

L-3 VERTEX AEROSPACE, LLC,
L-3 COMMUNICATIONS INTEGRATED SYSTEMS,
LP, L-3 COMMUNICATIONS HOLDINGS, INC.,
JOHN DOES 1-10, and ABC CORPORATIONS #1-10,

**Defendants.**
------------------------------------------------------------------------X

      **PLAINTIFF LORENZO CLARK** (hereinafter referred to as "Plaintiff"), by his attorneys, GODDARD LAW PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, New York 10006, alleges upon knowledge with respect to himself, and upon knowledge, information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

    1.    As set forth in detail below, Defendants provide military and intelligence products and services to the United States Government. Defendants hired Plaintiff to work on a United States Military Base in Afghanistan. Defendants maliciously and intentionally subjected Plaintiff to disparate treatment; subjected Plaintiff to a hostile work environment on the basis of his race and color; retaliated against Plaintiff on the basis of his complaints of racial discrimination; demoted Plaintiff; and terminated his employment on the basis of his race and color.

2.     Furthermore, Defendants retaliated against Plaintiff, demoted him, terminated his employment after he refused to participate in Defendants' fraudulent billing practices and serious public safety issues, and reported the same to his supervisors.

3.     Accordingly, this is a civil action brought on behalf of Plaintiff against all Defendants for discrimination and retaliation in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, the New York City Human Rights Law, and the False Claims Act 31 U.S.C. § 3729.

## THE PARTIES

### Plaintiff

4.     Plaintiff is an African-American citizen of the United States who currently resides in Atlanta, Georgia and who was employed by Defendants in Afghanistan.

### Defendants

5.     Defendant L-3 Vertex Aerospace, LLC. (hereinafter "Defendant Vertex"), upon information and belief, is a Delaware corporation with its principal place of business located at 8001 Mid America Boulevard, Suite 500, Oklahoma City, Oklahoma 73135, and is registered to do business in the State of New York.

6.     Defendant L-3 Communications Integrated Systems, LP. (hereinafter "Defendant Integrated"), upon information and belief, is a Delaware limited partnership with its principal place of business located at 10001 Jack Finney Boulevard, Greenville, Texas 75402, and is registered to do business in the State of New York.

7.     Defendant L-3 Communications Holdings, Inc., (hereinafter "Defendant L-3") is, upon information and belief, a Delaware corporation with its principle place of business located at 600 Third Avenue, 34th Floor, New York, New York, 10016.  Defendant L-3 is registered to do

business in New York. Defendant L-3 also maintains an office at 555 Industrial Drive South, Madison, Mississippi 39110. Upon information and belief, Defendant L-3 also goes by, or has gone by, the name "L-3 Communications Corporation."

8.      Upon information and belief, in or around December of 2016, Defendant L-3 changed its name to L-3 Technologies. Notably, upon information and belief, regardless of its official name, Defendants have always and continue to refer to themselves collectively as simply "L-3."

9.      Upon information and belief, Defendant L-3, Defendant Vertex, and Defendant Integrated (collectively the "Defendants") are alter egos of each other.

10.     Upon information and belief, Defendant L-3 maintains the headquarters and home base for Defendant L-3, Defendant Vertex, and Defendant Integrated in New York, New York. Upon information and belief, Defendant L-3 makes all employment decisions for Defendant L-3, Defendant Vertex, and Defendant Integrated.

11.     Upon information and belief, Defendants share the same higher management and human resources personnel and departments, as well as some of, if not all, the same employees. Moreover, upon information and belief, Defendant L-3 provided all employee benefits to all of Defendant L-3's, Defendant Vertex's, and Defendant Integrated's employees.

12.     At all relevant times, Defendant L-3 was under contract with the U.S. Army's Aviation, Maintenance and Training Command to supply parts and training for the Afghan government and military so that they can defend their country against insurgents (hereinafter referred to as the "Afghan Aviation Contract").

13.     Upon information and belief, ABC Corporations # 1-10 represent the other corporate defendants, whose identities are presently unknown, that owned, operated, and/or

3

controlled the day-to-day operations and management, and that jointly employed Plaintiff and are jointly and severally liable with the named defendants, Defendant L-3, Defendant Vertex, and Defendant Integrated.

14.     Upon information and belief, John Does # 1-10 represent the officers, directors, and/or managing agents of the named defendants, whose identities are unknown at this time and who participated in the day-to-day operations of the named defendants, acted intentionally and maliciously and who jointly employed Plaintiff and as such are jointly and severally liable with the named defendants and are "employer" within the meaning of applicable laws.

15.     At all relevant times, Plaintiff was an "employee" of all Defendant and Defendants were "employers" of Plaintiff.

16.     At all relevant times, Plaintiff was willing and able to perform his employment duties and obligations and was qualified for the employment position he held with Defendants.

17.     As set forth in detail below, the individual defendants directly participated in, condoned, and/or otherwise endorsed the discriminatory and retaliatory acts perpetrated against Plaintiff.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1343, 1981, 3729 and other relevant federal statutes.

19.     This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendants.

20.     Venue is proper in this case pursuant to 28 U.S.C. § 1391 because Defendant L-3 Communications Holdings, Inc., maintains its principle place of business at 600 Third Avenue, 34th Floor, New York, New York, which is in the Southern District of New York.

## PROCEDURAL REQUIREMENTS AND PROCEDURAL HISTORY

21.     On or about January 27, 2017, Plaintiff filed a charge with the EEOC (hereinafter referred to as Plaintiff's "EEOC Charge").

22.     On or about April 19, 2018, Plaintiff received a Right to Sue Letter.

23.     Plaintiff files this Complaint within 90 days of receiving the Right to Sue Letter.

## OPERATIVE FACTS

### Defendants' Relationship to One Another

24.     Upon information and belief, Defendants are alter-egos of each other and/or operate as a single entity. Upon information and belief, Defendant L-3 is a parent corporation and Defendant Vertex and Defendant Integrated act as mere divisions of Defendant L-3.

25.     Throughout Plaintiff's employment, Defendants represented to Plaintiff and his colleagues that the Defendants were 'one and the same,' and that **all** employees worked for "L-3."

26.     Plaintiff and other employees were routinely told by multiple supervisors that Defendant L-3 and all of its different divisions, including but not limited to Defendant Vertex and Defendant Integrated, were "the same thing" and "just all L-3".

27.     Plaintiff's uniforms, which he was required to wear, bore Defendant L-3's name on them. In addition, Plaintiff's paycheck came from Defendant L-3.

28.     Moreover, upon information and belief, Defendant L-3 provided Plaintiff with employee benefits.

29.     Throughout Plaintiff's employment, Defendants did, and upon information and belief continue to, operate as one entity under the "L-3" name.

30.     Indeed, upon information and belief, Defendants operated and continue to operate a single website encompassing all of L-3 and its divisions, which lists, among other things, employment opportunities with Defendants.  Additionally, Defendants, upon information and belief, provide the same Ethics Training Library to all 38,000 of its employees, which is provided by "L-3 Communications Corporation."

31.     Defendants further share a single corporate office in New York State. Indeed, Defendant L-3's website lists the corporate headquarters as located in New York, and states that L-3 has numerous locations worldwide.

32.     Throughout Plaintiff's employment, Plaintiff's managers discussed the "Corporate Office," and made it clear to Plaintiff and his colleagues, that all employees answered to Defendant L-3's corporate office in New York State. Defendant L-3 further publicly represents that it has "38,000" employees.

33.     Moreover, upon information and belief, Defendant L-3 is responsible for, and has in the past, assumed liability for all Defendants' legal issues. See Exhibits 9 through 11, annexed hereto.

**Plaintiff is Referred to Defendant L-3**

34.     Upon information and belief, as Plaintiff understood, Plaintiff was hired by Defendant L-3 as an L-3 employee.

35.     Indeed, upon information and belief, Defendant L-3, amongst other things, issued Plaintiff his regular paycheck via the same entity that it uses to pay all 38,000 of their employees,

6

paid Plaintiff's salary, and controlled the terms and conditions of Plaintiff's employment and compensation.

36.     Moreover, Plaintiff was issued a business email address by Defendant L-3, and upon information and belief, all 38,000 employees of the Defendants were given email addresses that ended in "@l-3com.com", and were also told to utilize the following emails generally, across the board -- gvlap.invoices.com and employee.reimbursement@l-3.com, ap.wires@l-3.com.

37.     Additionally, even when one of the Defendants' names appeared on a formal document, another L-3 name and logo would also appear on the document, such that the names L-3 Communications or L-3 Communications Integrated Systems would also appear separately on the document.

**Plaintiff is Hired by L-3 After Serving 24 Years in the US Air Force**

38.     On or about October 1, 2012 Plaintiff retired from the United States Air Force as a Master Sergeant (E-7) Aircraft Mechanic and Crew Chief. Plaintiff has served as a supervisor for over 10 years, supervising approximately 20 soldiers per shift.  His supervisory role included problem solving, organizing and assigning jobs, scheduling training, scheduling flights, and coordinating aircraft maintenance.

39.     Plaintiff retired as a disabled veteran due to, including but not limited to, exposure to toxic elements.

40.     In early 2013, Plaintiff was offered a mechanic's position at Defendants' Shinidad base.

41.     Upon information and belief, L-3 hires disabled veterans in order to increase their chances of winning and keeping lucrative Government contracts.

**Plaintiff Is Ordered to Take a Site Lead Role in Kabul**

42.     In or about September of 2013, Plaintiff was contacted by Bill Reynolds, a Caucasian man who served as Defendant L-3's "In Country Manager" for Defendants' Afghan Operations (hereinafter "Head Manager Reynolds").

43.     Head Manager Reynolds offered Plaintiff the role of "Site Lead" at the Kabul base due to his vast supervisory experience in the military.    The Kabul Site Lead role required daily oversight of the six mechanics who provided maintenance to the operations aircraft. Additionally, it was his understanding that his role would include the tracking of approximately 30 base employees, including their vacation time, rooms, passes, and travel logistics.

44.     Plaintiff told Head Manager Reynolds that he was happy with his position as a mechanic at the Shinidad base and that he was not at all interested in taking over the Kabul Site Lead role.

45.     Head Manager Reynolds refused to take no for an answer, and told Plaintiff that there was no one else who was qualified for the role and that they desperately needed to fill the position.

46.     Given no choice, Plaintiff reluctantly accepted the transfer, which came with an overwhelming amount of responsibility.

47.     Plaintiff repeatedly asked for a job description, but Defendants refused to provide same.

48.     Upon information and belief, Plaintiff's compensation increased only very slightly, despite the much greater responsibility.  Upon information and belief, Plaintiff was paid less than Caucasian employees assigned to the role of Site Lead.

8

49.     Plaintiff was shocked to learn that he would not be given any training for the role whatsoever. Furthermore, he was given absolutely no support. Upon information and belief, Defendants hired Plaintiff so that they could bill the Government for providing a Site Lead, but not actually implement the Site Lead's role.

50.     Shockingly, when Plaintiff arrived in Kabul, there was no Regional Manager, and upon information and belief Defendant had been without a Site Lead and without a Regional Manager for some time. Since there was no Regional Manager, Plaintiff was in charge of the base.

51.     In addition to reporting to Head Manager Reynolds, Plaintiff also reported to Head Manager Reynold's Bosses, Todd Jairde ("L-3 Manager Jairde"), Defendant L-3's Program Manager for L-3's Afghan Aviation Contract, and Walter House, L-3's Operations Manager ("L-3 Manager House"), who was in charge of the operations side of Defendant L-3's Afghan Aviation Contract.

**The Mechanics and Employees Refuse to Recognize Plaintiff's Authority**

52.     Plaintiff was shocked to find that the Kabul-based mechanics whom he was supposed to oversee refused to acknowledge him as their boss. The mechanics all refused to follow his orders and instructions and told him specifically that they were not required to and did not have to listen to him or take orders from him. Upon information and belief, Head Manager Reynolds had advised the mechanics that they did not have to listen to Plaintiff.

53.     Upon information and belief, the mechanics refused to recognize Plaintiff as their boss because of his race and skin color.

54.     Upon information and belief, Defendants did not want an African American person in a leadership role but were forced to name Plaintiff the Site Lead because he was the only employee qualified for the role.

55.     When Plaintiff complained to Defendants about the mechanics' refusal to follow his orders, and specifically told him that they did not have to listen to him, Defendants told Plaintiff that dealing with the mechanics was his problem, and refused to help.

**Plaintiff is Ridiculed for Trying to Correct a Scheduling Imbalance**

56.     When Plaintiff became the Site Lead he realized that, while the mechanics were working six days a weeks, the Instructors were only working four days a week.

57.     Upon information and belief, Defendants were billing the Government as if the instructors worked six day weeks.

58.     When Plaintiff realized that the instructors could and should be working on the aircraft, he went to L-3 Manager Jairde, who told him in no uncertain terms that the instructors did not report to him and that their schedules were none of his business.  Plaintiff told him that Defendants were "cheating" the Government by allowing the instructors to work four days a week and that the unfair schedule was affecting morale.

59.     L-3 Manager Jairde again dismissed Plaintiff and told him it was none of his concern.  Following his report of the schedule cheating, L-3 Manager Jairde treated Plaintiff even worse.

**The Mechanics Use the "N Word" About Plaintiff and Defendants Refuse to Intercede**

66.     In or about October of 2016, an employee named Webster Smith (hereinafter "Mr. Smith") approached Plaintiff and told him that the mechanics were racist and that they were referring to Plaintiff as the "N word" and would regularly say things like, "I am not going to listen to what that [N......] has to say."  Mr. Smith further reported that they had used the "N word" to refer to Plaintiff when speaking to L-3 Manager Jairde.

67. Plaintiff was dumbfounded that the mechanics felt so safe being so openly racist, and he approached L-3 manager Jairde about it. L-3 Manager Jairde asked, "Did you personally hear them call you that?" When Plaintiff stated that he had not personally heard the employees use the "N Word," L-3 Manager Jairde appeared annoyed and stated, "I'll see what I can do." Upon information and belief, he did nothing and the racism continued unabated.

68. There were significant staffing problems at Defendants' Kabul base, including the fact that there had not been a Distribution Manager at the L-3 Warehouse for more than two months, and as such, it was impossible to keep the highly dangerous inventory safe. Plaintiff routinely complained about the lack of key employees as well as the fact that unnecessary maintenance was being performed, simply so that Defendants could bill the Government and continue the project.

69. Still, Plaintiff struggled to keep the Kabul base operating properly with no support from Defendants and no respect from his employees.

**The Only Other African American Employee is Also Subjected to a Racially Hostile Environment**

70. During this time, Plaintiff was one of only two African American employees. Roy Lance Ware, (hereinafter "Mr. Ware"), the other African American employee, also endured outrageous racism and disrespect because of his skin color.

71. Mr. Ware and Plaintiff were constantly singled out and treated differently than the Caucasian employees

**Defendants' Finally Hire a Regional Manager, Who Admits to Plaintiff that Defendants are Racist**

72. In or about July of 2015, Defendants finally hired a Regional Manager named James "Jim" Price ("Regional Manager Price"), who was Caucasian. Upon information and belief,

Regional Manager Price had no management experience and Plaintiff should have been offered the job.

73.     Still, Plaintiff was thrilled to have Regional Manager Price installed in the position because Defendants' employees at the base were willing to listen to Regional Manager Price. Plaintiff advised Regional Manager Price as to which employees should be doing what, and Regional Manager Price gave the orders, which were then performed.

74.     Regional Manager Price routinely acknowledged the racism and specifically revealed that the racist attitudes and decision making came from the top, and he specifically told both Plaintiff and Mr. Ware that Defendants' Supervisors routinely said racist things about both of them.

**Regional Manager Price Quits but Plaintiff is Denied The Position**

75.     When Regional Manager Price quit the Regional Manager position, Plaintiff asked L-3 Manager Jairde for the position, since he was the most qualified person at the base. Manager Jairde refused to consider him for the position and instead laughed and said, "No no we'll get someone else in that position. You don't have the experience for that." Manager Jairde refused to consider Plaintiff's 24 years of military service, including 10 years of management experience, and Manager Jairde was well aware that Plaintiff had far more experience than Regional Manager Price.

76.     Upon information and belief, Manager Jairde refused to consider him for the position because of his race and skin color. Upon information and belief, Defendants do not believe that African American employees should have leadership roles at L-3.

77.     Upon information and belief, the Regional Manager position pays approximately $30,000 more than the Site Lead position that Plaintiff was in.

12

**Plaintiff Is Reprimanded for Questioning Illegal Equipment at the L-3 Warehouse**

78.    To his shock, Plaintiff soon discovered that highly dangerous and illegal weapon units were present in the warehouse in flagrant violation of L-3's Government contract, and upon information and belief, purposefully omitted from the inventory submitted to the Government by Defendants.

79.    Plaintiff reported the existence of the illegal and dangerous units to his Supervisors, and in response, was told in no uncertain terms that the weapons were a "supply matter" being dealt with by the "home office" and that, once again, it was none of his business.

80.    Thereafter, Defendants grew more and more gruff with Plaintiff.

**Plaintiff Witnesses Overt Discrimination Against Several Minority Employees**

81.    Plaintiff soon realized that racial discrimination was a problem for all minority employees at Defendant.

82.    Plaintiff regularly observed minority employees being treated unfairly, and subjected to a hostile work environment.  Supervisors regularly blatantly plotted "to get rid of" minority employees, screamed and yelled at them, and disciplined them for actions which they did not discipline Caucasian employees for.

**Plaintiff Discovers Defendants' Fraudulent and Racist Leave Policy**

83.    Plaintiff was contacted by a minority employee who reported that he had learned that the Defendants were cheating the Government by sending employees on extra vacation time, but pretending that those employees were working. Upon information and belief, Defendants did not "dock" employees who took leave but instead continued to charge the Government as if the employees had worked, and paid the employees as if they had worked.  Plaintiff was further

advised that employees were then able to "sell" their leave time back to Defendants, who upon information and belief, charged the Government.

84.     Plaintiff reported that he was not aware of such a policy and that he did not believe that it could be true. He assured the employee that he would review all of the vacation time in his possession and make sure that they had been charged for their leave time.

85.     Upon reviewing the vacation records Plaintiff realized that none of the Caucasian employees had been docked for their vacation time. Even more shockingly, all of the African-American employees had been docked for their vacation time.

86.     Plaintiff then called Defendants and told them that it seemed that only a certain segment of the population was being billed for their vacation time. Plaintiff requested a spreadsheet of all vacation time.

87.     L-3 Manager Jairde told Plaintiff that it was none of his business who took what vacation time, and warned him that he should proceed carefully.

88.     Plaintiff was shocked, as it was clear that, upon information and belief, Defendant L-3 was defrauding the Government by billing for time while people were on vacation and/or for selling the vacation time back to the Government.

89.     Additionally, Defendants only applied this illegal windfall to Caucasian employees.

90.     Plaintiff went to several of Defendants' managers to object to the fraudulent and racist leave policy, to no avail.

91.     Each time Plaintiff objected to Defendants' fraudulent and racist leave policy, Plaintiff was treated even more hostilely.

14

**Plaintiff Complains About Racism Against the Afghani Students**

92.     Part of L-3's job was to train Afghani students on how to maintain the aircraft. Upon information and belief, Defendants did not want to teach anyone else how to maintain the aircraft, because it would have made Defendants' services obsolete.

93.     Plaintiff was extremely frustrated to see that L-3 was intentionally failing to train the students.

94.     Plaintiff was appalled when certain Defendant L-3 employees were openly racist and hostile to Afghani students brought to the base for training.

95.     An employee named Jim Gallagher despised the Afghani students and was hostile and hateful towards them. He routinely called them "lazy" and "worthless."

96.     When Plaintiff complained about Gallagher's racism to L-3 Manager Jairde, he was instructed to "back off." Manager Jairde petulantly responded that there was clearly just a misunderstanding.

97.     Plaintiff told L-3 Manager Jairde that the U.S. Army officers were aware of the blatant racism at the base, and L-3 Manager Jairde told Plaintiff he did not know what he was talking about.

**African American Employees are Treated Less Well Than Caucasian Employees**

98.     Plaintiff noticed several other ways in which he and other minority employees were treated less well. The managers refused to socialize with the minority employees outside of work but regularly interacted with Caucasian employees.

99.     Additionally, upon information and belief, minority employees were routinely denied training opportunities, which were instead given to Caucasian employees.

100.    Upon information and belief, the lack of training opportunities interfered with career advancement. Despite constantly asking for training, Plaintiff was given just four training opportunities, while his Caucasian co-workers were given twice as many training opportunities.

101.    When Plaintiff pointed out the discrepancy in training opportunities to L-3 Manager Jairde, he was told it was none of his business who got what training.

102.    Each and every time Plaintiff made a request to management, whether it be for a piece of equipment, a program or something else, he was interrogated and made to wait. Other employees regularly commented that they could not understand why L-3 Manager Jairde gave Plaintiff such a hard time for trying to do his job, but was completely supportive of Caucasian employees.

103.    Caucasian employees were held to lower standards and allowed to disrespect Plaintiff.

**Regional Manager Johnson Reveals that he was told to "Keep an Eye On" Plaintiff**

104.    Ultimately, the Regional Manger position was filled by Dan Johnson ("Regional Manager Johnson"). Initially, Regional Manager Johnson appeared suspicious of and distant towards Plaintiff. However, when Regional Manager Johnson got to know Plaintiff, he told him that he was doing a really good job and further revealed that L-3 Manager Jairde had told him to "watch out" for Plaintiff and keep an eye on him, because he did not believe he did his job.

105.    Upon information and belief, Respondents were looking for reasons to fire Plaintiff.

**Respondents Eliminate Plaintiff's Position In Order to Get Rid of Him**

106.    In or about January of 2014, Respondents "eliminated" Plaintiff's Site Lead position and demoted him to the role of "Scheduler." Plaintiff's salary was decreased by $50,000. Upon information and belief, the Site Lead role continued to exist at the other bases. Upon

16

information and belief, the only reason Plaintiff's position was eliminated was because he complained about and objected to racism and blew the whistle on Defendants' multiple illegal and unethical acts.

107.    This demotion was meant to and did adversely affect and ruin Plaintiff's overseas career.

108.    Plaintiff was humiliated at the base.

109.    Due to the demotion, Plaintiff was not able to find another job and had to remain in the demoted role of Scheduler.

**CESSNA Takes Over the Contract and Brings Over Most of the Employees - But Not Plaintiff**

110.    Ultimately in or about August of 2016, Parent Company CESSNA took over the contract and decided to stop using L-3 as a sub-contractor. Almost all of the employees on the base were hired by CESSNA and continued working. Plaintiff was let go. Upon information and belief, Plaintiff was purposefully given a bad recommendation by Defendants in retaliation for his complaints about racism and in retaliation for his whistle blowing activities, and because they were concerned that Plaintiff would reveal their vacation scam and failure to train the Afghani students to CESSNA.

## CLAIMS FOR RELIEF
## AS AND FOR A FIRST CAUSE OF ACTION
*(Race Discrimination in Violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 the New York State Human Rights Law, and the New York City Human Rights Law)*

111.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if set forth herein.

112.    Plaintiff is an African-American male, and is therefore a member of a protected class.

17

113.    Plaintiff was qualified to work as an employee for Defendants and he satisfactorily performed the duties required by the position he held at Defendants.

114.    Defendants intentionally subjected Plaintiff to a hostile work environment, disparate treatment, and an atmosphere of adverse employment actions and decisions that culminated in Plaintiff's unlawful discharge/constructive discharge, because of his color and race in violation of Plaintiff's statutory and constitutional rights.

115.    The discriminatory actions perpetrated against Plaintiff were performed purposefully or with willful indifference by Defendants' policymakers and were in accordance with Defendants' custom and/or policy and/or practice of discrimination.

116.    By reason of Defendants' repeated violations of Plaintiff's statutory and constitutional rights, Plaintiff has suffered a loss of monetary and other benefits associated with his employment.

117.    As a further direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

118.    Plaintiff was discriminated against, subjected to disparate treatment and disparate discipline on the basis of his color and race, and subjected to a hostile work environment on the basis of his color and race in violation of § 1981 of the United States Code, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law.

18

119. As a result of Defendants' violations of Plaintiff's civil rights, Plaintiff has been damaged in the sum of no less than $3,000,000.00.

**AS AND FOR A SECOND CAUSE OF ACTION**
*(Retaliation in Violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law)*

120. Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if set forth herein.

121. As set forth in detail above, Defendants subjected Plaintiff to a hostile work environment, disparate treatment, disparate discipline and an atmosphere of adverse employment actions and decisions because of his color and race in violation of Plaintiff's civil rights.

122. Plaintiff repeatedly complained to Defendants and/or Defendants' policymakers who themselves regularly witnessed the severe and pervasive race and color discrimination and hostile work environment he was subjected to during his employment with Defendants.

123. Plaintiff notified Defendants of the severe race and color discrimination and hostile work environment he was subjected to and repeatedly protested to the harassment and discrimination. Plaintiff further complained about the fact that Defendants failed to act responsively to his concerns and complaints of discrimination.

124. Plaintiff's complaints were repeatedly ignored and discouraged by Defendants in accordance with Defendants' policy, practice, and/or custom of discrimination and retaliation.

125. Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of race and color discrimination and a hostile work environment.

126. Because he protested Defendants' unlawful behavior, Plaintiff was subjected to retaliation throughout the course of his employment.

127.    The retaliation substantially interfered with Plaintiff's employment and created an intimidating, offensive, and hostile work environment.

128.    Because Defendants feared that he would report the unlawful behavior that he protested, Defendants terminated Plaintiff's employment.

129.    Defendants knew or should have known about the retaliation and the affect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct, and in fact allowed Plaintiff to suffer a retaliatory termination.

130.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to: wages, social security, and other benefits due him.

131.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

132.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

133.    Based on the foregoing, Plaintiff was retaliated against and suffered a retaliatory termination by Defendants in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law.

134.    As a result of Defendants' retaliatory actions, Plaintiff has been damaged in the sum of no less than $3,000,000.00.

## AS AND FOR A THIRD CAUSE OF ACTION
*(Retaliation in Violation of the False Claims Act 31 U.S.C. § 3729)*

135.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if set forth herein.

136.    As set forth in detail above, Plaintiff engaged in protected activity under the False Claims Act 31 U.S.C. § 3729.

137.    In response to Plaintiff's lawful complaints and protected activities, Plaintiff was retaliated against and wrongfully discharged by Defendants.

138.    As a result of Defendants' retaliatory actions, Plaintiff has been damaged in the sum of no less than $3,000,000.00.

### PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

(i)    On the First Cause of Action, awarding Plaintiff compensatory and other damages including punitive damages in an amount to be determined at trial but in any case no less than $3,000,000.00;

(ii)    On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $3,000,000.00;

(iii)    On the Third Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $3,000,000.00; and

(iv)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, NY
       July 16, 2018

Respectfully submitted,

GODDARD LAW PLLC
*Attorney for Charging Party*

By:_____
Megan S. Goddard, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Ofc: 646-504-8363
Fax: 212-473-8705
megan@goddardlawnyc.com